# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **RODERICK D. BRYANT, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-CV-563-RDP** |
| | } | |
| **JOHNNY KYNARD LOGGING, INC.,** | } | |
| **et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the July 23, 2012 Motion for Summary Judgment (Doc. #52) filed by Defendants Johnny Kynard Logging, Inc. ("Kynard Logging"), Double K Logging, LLC ("Double K Logging"), Wiggins Trucking, LLC ("Wiggins Trucking"), and John W. Kynard, III ("Kynard") (hereinafter collectively referred to as "Defendants"). The Motion (Doc. #52) has been fully briefed (Docs. #52-54, 63, 66-68, 75) and is properly under submission. For the reasons outlined below, the court finds that the Motion for Summary Judgment (Doc. #52) is due to be granted in part and denied in part.

## I.    Procedural History

Plaintiffs Roderick D. Bryant ("Bryant") and Charles E. Teacher ("Teacher") commenced this action by filing a Complaint in this court on February 18, 2011 (Doc. #1), and have alleged the following claims: (1) Defendants violated the Fair Labor Standards Act ("FLSA") by failing to compensate Plaintiffs for  overtime and by retaliating against Bryant[1] for his complaint about

---

[1]Plaintiffs' Amended and Substituted Complaint specifically states that "Defendants retaliated against plaintiff ***Bryant*** for his complaint about the defendants[' failure to pay] him overtime for all hours worked in excess of 40 hours during his employment with them." (Doc. #18 at ¶ 84) (emphasis added). Plaintiffs Amended and Substituted Complaint contains no allegations that Defendants retaliated against Teacher under the FLSA. Additionally, Plaintiffs' arguments

Defendants' failure to pay him overtime; (2) Defendants violated 42 U.S.C. § 1981 ("Section 1981") by discriminating against Plaintiffs on the basis of their race; and (3) Defendants violated Section 1981 by retaliating against Bryant.[2]  Plaintiffs filed an Amended and Substituted Complaint on August 31, 2011 (Doc. #18), wherein Bryant added race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ("Title VII").[3]

Defendants' Motion for Summary Judgment (Doc. #52) asserts that: (1) Plaintiffs' FLSA claims fail because (i) Plaintiffs' claims are subject to the two-year statute of limitations; (ii) Defendant Double K Logging is exempt from the provisions of the FLSA because it employed eight or fewer employees for each week during all time periods relevant to the case; (iii) Defendant

---

regarding any FLSA retaliation claims in their Opposition to Summary Judgment state only that "***Bryant*** was damaged" for these alleged violations. (Doc. #68, p. 45) (emphasis added).  As such, because Teacher has not asserted any FLSA retaliation claims, all Defendants are entitled to summary judgment on any FLSA retaliation claims purportedly asserted by Teacher.

[2]Plaintiffs' Amended and Substituted Complaint states that "the Defendants intentionally and wrongfully retaliated against plaintiff ***Bryant*** in violation of § 1981." (Doc. #18 at ¶ 97) (emphasis added).  Plaintiffs' Amended and Substituted Complaint does not make any allegations that Defendants retaliated against Plaintiff Teacher in violation of Section 1981.  Moreover, the only arguments made and evidence cited related to this claim in Plaintiff's Opposition to Summary Judgment relates to Defendants' alleged treatment of Bryant.  (*See* Doc. #53, pg. 51).  Accordingly, all Defendants are entitled to summary judgment on any Section 1981 retaliation claims purportedly asserted by Teacher.

[3]The Amended and Substituted Complaint states that "***Bryant*** now amends herein his original Complaint to include Title VII counts." (Doc. #18 at ¶ 5) (emphasis added).  Specifically, the Amended and Substituted Complaint alleges that Bryant (but not Teacher) "filed a charge under Title VII against defendant John W. Kynard III d/b/a Johnny Kynard Logging, Inc. with the U.S. Equal Opportunity Commission ("EEOC") within 180 days of the last act of discrimination against him on August 30, 2010." (Doc. #18 at ¶ 4).  Plaintiffs attached Bryant's EEOC charge as an exhibit to their Opposition to Summary Judgment. (*See* Doc. #63, Ex. UU).  Neither Plaintiffs' Amended and Substituted Complaint nor their Opposition to Summary Judgment alleges Teacher filed a charge of discrimination with the EEOC.  Plaintiffs' Amended and Substituted Complaint does not include any language suggesting that Teacher added Title VII claims, and in fact, the factual  allegations contained under the Title VII counts (IV and V) clearly indicate that only Bryant added Title VII claims against Defendants. (*See* Doc. #18 at ¶¶ 104,  112).  The Amended and Substituted Complaint does not contain allegations that Defendants discriminated or retaliated against Plaintiff Teacher in violation of Title VII, and, accordingly, the court does not address any such claims (despite the parties' reference to Teacher's Title VII claims in their summary judgment briefs).  Therefore, all Defendants are entitled to summary judgment on any Title VII claims purportedly asserted by Teacher.  Additionally, because Defendants have not challenged the timeliness or scope of Bryant's EEOC charge,  the court does not consider this jurisdictional requirement, and will consider the merits of Plaintiff Bryant's Title VII claims below.

Wiggins Trucking is exempt from the FLSA because it employed eight or fewer employees; and (iv) Defendants are not a single enterprise for purposes of the FLSA; (2) Plaintiffs' discrimination claims under Section 1981 and Title VII fail because (i) Plaintiffs have failed to make a *prima facie* case of discrimination; and (ii) Defendants have not discriminated against Plaintiffs on the basis of their race; and (3) Plaintiffs' retaliation claims fail because Plaintiffs have not established a *prima facie* case of retaliation under the FLSA, Title VII, or Section 1981.

On July 23, 2012, Defendants filed a memorandum of law (Doc. #53) and evidence[4] (Doc. #54) in support of their motion.  On August 29, 2012, Plaintiffs filed an opposition to Defendants' motion[5] (Doc. #68) and evidence[6] (Docs. #66, 67) in support of their opposition.  Previously, on

---

[4]Defendants submitted the following evidence: Deposition of Roderick Bryant (Exhibit A); Deposition of Charles Teacher (Exhibit B); Deposition of Johnny Kynard (Exhibit C); Deposition of Gary Scott Kimbrel (Exhibit D); Deposition of Robert Wiggins (Exhibit E); Deposition of Michelle Montz (Exhibit F); Deposition of Jaky Broussard (Exhibit G); Johnny Kynard Logging, Inc. Corporate and Financial Documents (Exhibit H); Double K Logging, LLC Corporate and Financial Documents (Exhibit I); Wiggins Trucking, LLC Corporate and Financial Documents (Exhibit J).

[5]Plaintiffs did not state their facts in compliance with the court's summary judgment requirements, which are set forth in Appendix II to the Initial Order.  As required by Appendix II, Plaintiffs did respond to Defendants' statement of facts and set forth additional undisputed facts in numbered paragraphs.  (*See* Doc. #68).  However, pages 11 through 16 of Plaintiffs' Opposition contains nothing but factual statements in unnumbered paragraphs.  (*See* Doc. #68). Although the court may *sua sponte* strike these factual statements due to noncompliance with the briefing requirements, the court has elected not do so.  Rather, given the complex factual background of this action, the court has reviewed this section of Plaintiffs' Opposition to help ensure that it provides a detailed and thorough statement of undisputed facts for purposes of summary judgment.  Nevertheless, Plaintiffs' counsel is advised to comply with the court's briefing requirements in this and future actions.

[6]Plaintiffs submitted the following evidence: Plaintiff Bryant's Response to Defendants' Interrogatories (PEX A); Plaintiff Teacher's Response to Defendants' Interrogatories (PEX B); Affidavit of Roderick D. Bryant (PEX C); Affidavit of Matthew T. Moore (PEX D); Deposition of John W. Kynard, III (PEX E); Deposition of Lafabian M. Ward (PEX F); Deposition of Johnnie C. Webb (PEX G); Business Entity Details for Kynard Businesses (PEX H); Wiggins Trucking's Answers to Plaintiffs' Interrogatories (PEX I); Double K Logging's Answer to Plaintiffs' Interrogatories (PEX J); Kynard's Answers to Plaintiffs' Interrogatories (PEX K); Kynard Logging's Answers to Plaintiffs' Interrogatories (PEX L); Kynard's Responses to Ward's Interrogatories in 2:08-cv-783 (PEX M); Kynard Logging's Responses to Webb's Interrogatories in 2:08-cv-783 (PEX N); Ward's Responses and Supplemental Responses to Defendants' Interrogatories in 2:08-cv-783 (PEX O); Kynard Logging Employee Data Received from Kynard Logging (PEX P); Double K Logging Employee Data Received from Double K Logging (PEX Q); Table of Kynard Logging Employees in the Three Year Period Ending April 2009 who Received Company Paid Insurance by Position and Race (PEX R); Kynard Logging Responses to Plaintiffs' Requests for Admissions (PEX S); Kynard's Responses to Plaintiffs' Requests for Admissions (PEX T); Double K Logging's Response to Plaintiffs' Requests for Admissions (PEX U);

August 24, 2012, Plaintiffs filed various evidentiary submissions under seal[7] in support of their

opposition.  Defendants filed a reply brief (Doc. # 75) with one evidentiary exhibit on September 21,

2012.

## II.  Legal Standards for Evaluating a Summary Judgment Motion[8]

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI

Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and identifying those

---

Wiggins Trucking's Responses to Plaintiffs' Request for Admissions (PEX V); Note Regarding Loans to Wiggins Trucking (PEX W); Payroll Dat for Bryant and Teacher (PEX X); Selected Documents from Prior FLSA Lawsuits Against the Defendants (PEX Y); Double K Logging Employee Count Based on Payment Checks Located in PEX BB, CC, and DD, Filed Under Seal, and Counting Employees in the Centralized Office, Employees who Have Identified Themselves in Lawsuits, and Employees at Kimky Chipping (PEX Z); Employees who Received Paid Family Health Insurance by Race (PEX 1); Comparison of Driver Pay by Entity by Race (PEX 2); Interchanges of JKL, DKL, Wiggins Trucking Employees (PEX 3); Examples of Checks Signed by Michelle Montz for Double K Logging (PEX 4); Review of Double K Logging Tax Returns for 2008 and 2009 (PEX 5)

[7]These exhibits included: Wiggins Trucking's Bank Statements for 2009 (PEX AA); Double K Logging's Bank Statements for 2008 (PEX BB); Double K Logging's Bank Statements for 2009 (PEX CC); Double K Logging's Bank Statements for 2010 (PEX DD); Double K Logging's Bank Statements for 2008 From Peoples Bank (PEX EE); Johnny Kynard Logging's Bank Statements for 2008 (PEX FF); Johnny Kynard Logging's Bank Statements for 2009 (PEX GG); Johnny Kynard Logging's Bank Statements for 2010 (PEX HH); Johnny Kynard Logging's Bank Statements for 2008, Second Checking Account (PEX II); Johnny Kynard Logging's Bank Statements for 2009, Second Checking Account (PEX JJ); Johnny Kynard Logging's Bank Statements for 2012 Through August, Second Checking Account (PEX KK); Defendants' Internal Bills of Sale for Wiggins Trucking's Truck (PEX LL); Title Documents for Wiggins Trucking's Truck (PEX MM); Loan Documents Related to Wiggins Trucking's Truck (PEX NN); Truck Insurance Policy (PEX OO); Selected Phone Records of Robert Wiggins (PEX PP); Blue Cross/Blue Shield Enrollment Listings for Johnny Kynard Logging (PEX QQ); November 19, 2009 BlueCross/Blue Shield Processed Claim Report for Sammie Williams (PEX RR); Income Tax Returns for 2009 & 2010 or Robert Wiggins (PEX SS); Income Tax Returns for 2008, 2009, and 2010 for Double K Logging (PEX TT); EEOC Charges Against Johnny Kynard Logging (PEX UU); Wiggins Trucking's Bank Statements for 2010 & 2011 (PEX ZZ).

[8] Federal Rule of Civil Procedure 56 was amended on December 1, 2010.  However, even considering the 2010 amendments, "the standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 Advisory Committee's Note (2010 Amendments).

portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once a moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman,* 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)).

If a moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115. Once a moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If a moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, a movant may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once a moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which a moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that a nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires a movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.

If a movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or a nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, a nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

6

III.    **Relevant Undisputed Facts**[9]

A.    **Defendant Johnny Kynard Logging, Inc.**

Kynard Logging is a logging operation that formed in 1996. (Doc. #54, Ex. H, Kynard Logging Articles of Incorporation).  Its principal place of business is in Greensboro, Hale County, Alabama, and it is currently owned entirely by Kynard, a white male who lives in Hale County. (Doc. #54, Ex. C, Kynard Dep. at 7).  Prior to June 3, 2011, Kynard owned fifty percent and his former wife, Michelle Kynard owned fifty percent.  (Doc. #66, Ex. K, Kynard Resp. to Teacher's Interr. 6). Michelle Montz ("Montz") is the bookkeeper/office manager for Kynard Logging.  (Doc. #54, Ex. F, Montz Dep. at 19).

Kynard Logging is primarily a clear-cut logging operation that may have also done thinning logging work at times.  (Doc. #54, Ex. H, Corporate Documents; Doc. #54, Ex. D, Kimbrel Dep. at 196).  At all times material to this matter, Kynard Logging employed more than eight people.  (Doc. #54, Ex. F, Payroll Roster Exhibit # 21 to Montz Dep.).   A group of plaintiffs filed a FLSA lawsuit against Kynard Logging and Kynard  in May 2008. (Doc. #54, Ex. C, Kynard Dep. at 52).[10]   The parties settled that lawsuit in August 2010. (*See* Docs # 126, 129, *Lababian Ward v. Johnny Kynard Logging* Case No: 2:08-cv-783-AKK (N.D. Ala.)).  In June 2008, a collective action suit alleging FLSA violations was filed against Kynard Logging and Kynard. (Doc. #67, Ex. Y; *See also Mauldini*

---

[9]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only. They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[10]During his deposition testimony, Kynard recalled that Kynard Logging was originally sued in July 2008. However, a search in the court's electronic filing system indicates Kynard Logging was sued for FLSA violations in May 2008.  (*See* Doc. #1, Complaint in *Lababian Ward v. Johnny Kynard Logging*, 2:08-cv-783-AKK).

*v. Johnny Kynard Logging, Inc.*, 2009 WL 455479 (Feb. 20, 2009 S.D. Ala.)).  Bryant contends he did not opt-in to this collective action suit.

**B.      Defendant Double K Logging, LLC**

Double K Logging is a logging operation that was formed in 2006. (Doc. #54, Ex. I, Double K Articles of Organization).  Kynard and Gary Scott Kimbrel ("Kimbrel"), who is also a white male, own Double K Logging equally in fifty percent shares.  (Doc. #54, Ex. H, Kimbrel Dep. at 13).  Jaky Broussard is the bookkeeper/office manager for Double K Logging. (Doc. #54, Ex. G, Broussard Dep. at 12).

Double K Logging is predominantly a thinning logging operation that works in Hale and surrounding counties.  (Doc. #54, Ex. C, Kynard Dep. at 26).  Double K Logging also does some clear-cut logging.  (Doc. #54, Ex. D, Kimbrel Dep. at 195-96).  According to its payroll records, Double K Logging has never had more than eight employees.  (Doc. #54, Ex. I, Payroll Records). Double K Logging pays its employees a weekly salary that generally does not take into account the number of days or hours an employee may work in any given week.  (Doc. #54, Ex. D, Kimbrel Dep. at 54-56; Doc. #54, Ex. G, Broussard Dep. at 24-26).   At all times material to this action, all of Double K Logging's truck drivers were  African American.  (Doc. #54, Ex. D, Kimbrel Dep. at 43-44).

**C.      Defendant Wiggins Trucking, LLC**

Wiggins Trucking was a trucking operation formed in 2008 by Robert Wiggins ("Wiggins"), an African American male, and he was the sole owner of the company.  (Doc. #54, Ex. E, Wiggins Dep. at 21; Doc. #54, Ex. J, Wiggins Trucking Articles of Organization).  Wiggins was a full time employee of Kynard Logging.  (Doc. #54, Ex. E, Wiggins Dep. at 12).  Wiggins Trucking is no

longer in operation.  (Doc. #54, Ex. E, Wiggins Dep. at 25).   While Wiggins Trucking was in business, Montz was the bookkeeper/office manager.  (Doc. #54, Ex. E, Wiggins Dep. at 37). Bryant was the only individual ever employed by Wiggins Trucking. (Doc. #54, Ex. J, Wiggins Payroll Records).  Although Wiggins Trucking hauled logs for four companies — Pete Barnett Logging, Blue Ox,  Kynard Logging, and Double K Logging (Doc. #54, Ex. E, Wiggins Dep. at 145-46) — over ninety-five percent of the time, Wiggins Trucking hauled logs for Kynard Logging. (Doc. #54, Ex. E, Wiggins Dep. at 146).

> **D.    Relationship Among Defendants Kynard Logging, Double K Logging, and Wiggins Trucking**

Each of the Defendants have their own separate incorporation documents. (Doc. #54, Exs. H, I, and J).  Each Defendant has its own bank account, files its own tax returns, and has its own payroll.  (Doc. #54, Exs. H, I, and J).  Defendants have access to each other's bank accounts and do not always pay their own bills.  (*See* Doc. #63, Ex. AA, Ex. BB).  For instance, on October 1, 2009, Kynard Logging deposited $8,000.00 into Wiggins Trucking's account.  (Doc. #63,  Ex. AA).  That same day, Montz wrote a check to Kynard personally for $8,000.00.  (Doc. #63, Ex AA, check 1102, p. 175).  Records from Kynard Logging reflect thousands of dollars in loans to Wiggins Trucking from February 14, 2009 to October 09, 2009.  (Doc. #66, Ex. W, Johnny Kynard Logging Note Regarding Loans to Wiggins Trucking).  A review of Double K Logging's tax returns for 2008 and 2009 reveal that it bought equipment totaling $149,500.00 from Kynard Logging.  (Doc. #66, Ex. 5).

Kynard Logging and Double K Logging rarely fell timber at the same site.  (Doc. #54, Ex. B, Teacher Dep. at 52; *Id*., Ex. A, Bryant Dep. at 87).  Kynard would go to the Double K work site

less than once a month.  (Doc. #54, Ex. C., Kynard Dep. at 133).  Nevertheless, Kynard gave direct orders to Bryant and other Double K Logging employees.  (Doc. #66, Ex. C, Bryant Aff. at ¶¶ 13-14).  Kynard also conducted meetings with Double K Logging employees.  (Doc. #66, Ex. C, Bryant Aff. at ¶16).  Additionally, Kynard would call Double K Logging employees on the two way radio to tell them what to do or, in some instances, have another employee relay the message.  (Doc. #66, Ex. C, Bryant Aff. at ¶17).

According to Double K Logging's payroll roster, two employees had company provided health insurance — Jimmy Breland ("Breland"), the crew foreman, and Sammie Williams ("Williams"), a former employee who was an African American truck driver. (Doc. #54, Ex. 23 to Broussard Dep., Double K Payroll Roster).  However, it was Kynard Logging which paid for the insurance coverage for these two Double K Logging employees.  (Doc. #63, Ex. QQ, Kynard Logging Blue Cross Blue Shield Enrollment Listing).  According to Double K Logging's Payroll Roster, Williams was employed from July 2, 2008 until March 30, 2010. (Doc. #54, Ex. 23 to Broussard Dep., Double K Payroll Roster).  Kynard Logging's insurance enrollment information reflects that its contract with BlueCross/BlueShield was adjusted to delete Williams from coverage effective April 1, 2010.  (Doc. #63, Ex. QQ, Kynard Logging Blue Cross Blue Shield Enrollment Listing, p. 1702).

### E.    Plaintiff Bryant's Employment with Defendants

#### 1.    Bryant's Employment With Kynard Logging

Bryant is an African American male who worked for Kynard Logging from approximately November 2003 until July 2008. (Doc. #54, Ex. 1, Bryant Dep. at 40, 57; Doc. #54, Ex. H, Payroll Records).  Kynard was Byrant's supervisor at Kynard Logging.  (Doc. #66, Ex. A, Bryant Resp. to

Defs' Interr. 4).  Bryant generally was paid $600 per week.  (*Id.*).  He also would get paid $129.00

to work on Saturdays but sometimes he would not be paid that extra amount if Kynard Logging's

operations had been rained out earlier in a given work week.  (*Id.*).  Prior to 2008, Kynard Logging

did not take into account the number of hours an employee worked in any given work week.  (Doc.

#75, Defs' Resp. to Pls' Additional Undisputed Facts).  Bryant left Kynard Logging on July 3, 2008

when Kynard transferred him to Double K Logging. (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr.

4).  Prior to that date, Bryant and Demetrius Thomas ("Thomas") (who was also an African

American driver for Kynard Logging), had been hauling for Double K Logging until Double K

Logging could hire more drivers.  (Doc. #66, Ex. C., Bryant Aff. at ¶¶ 2-4).

### 2.     Bryant's First Employment With Double K Logging

Bryant first worked for Double K Logging from July 2008 until December 2008.  (Doc. #54,

Ex. 1, Bryant Dep. at 36-37).  Double K Logging did not keep records of times and weekends that

Bryant worked.  (Doc. #75, Defs' Response to Pls' Additional Undisputed Facts).  During Bryant's

employment with Double K, after working a five day work-week, he worked several Saturdays for

which he was not paid.  (Doc. #54, Ex. A, Bryant Dep. at 132-35).  Double K Logging did not pay

Bryant time and half for all hours worked in excess of 40 hours per week.  (Doc. #67, Ex. T, Kynard

Resp. to Pls' Requests for Admission No. 3).  Kynard controlled Bryant's pay at Double K Logging.

(Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 15).  Bryant had requested to be paid for overtime

and to receive paid health insurance given to most Kynard Logging white employees.  (*Id.*).  Bryant

was never fired for asking about health insurance.  (Doc. #54, Ex. A., Bryant Dep. at 176).

For two or three months in 2008, while he was working at Double K Logging, Bryant was

actually paid by Kynard Logging.  (Doc. #66, Ex. C, Bryant Aff. at ¶8).   Even after he was

11

transferred to Double K Logging, the trucks Bryant operated still had the name "Johnny Kynard Logging" on them, and that lasted for six or seven months.  (Doc. #66, Ex. C, Bryant Aff. at  ¶9). While working at Double K Logging, Bryant dealt with Kynard about seventy five percent of the time.  (Doc. #66, Ex. C, Bryant Aff. at ¶15).

Before Bryant left Double K Logging to work for Wiggins Trucking, Wiggins told Bryant that he mortgaged his home to buy the truck Bryant drove from Kynard and that Bryant would be given the first opportunity to take a job with Wiggins Trucking or Wiggins would find someone else for the job.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant understood that if he did not take the job with Wiggins Trucking he would no longer have a job with Double K Logging.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Kynard told Bryant that he would ensure Wiggins paid Bryant $800.00 per week.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).

### 3.    Bryant's Employment With Wiggins Trucking

Bryant worked as a truck driver for Wiggins Trucking from December 2008 until January 2010.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  During Bryant's employment with Wiggins Trucking, Wiggins was Bryant's supervisor.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant never took a direct order from Kynard while he worked at Wiggins Trucking, and Wiggins told Bryant where to go to pick up logs.  (Doc. #54, Ex. A., Bryant Dep. at 28-29).  Wiggins Trucking did not keep records of times and weekends that Bryant worked.  (Doc. #75, Defs' Response to Pls' Additional Undisputed Facts).

Wiggins Trucking paid Bryant $800.00 per week for working Monday through Friday.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant originally was paid $160.00 when he worked on Saturdays.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  At some point, Wiggins Trucking

stopped paying Bryant (or only paid him one-half of a day's pay) on days that were rained out.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Also, Bryant was not paid during a three week period when the truck he drove broke down and was being serviced.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Eventually, Wiggins began paying Bryant $160.00 per day instead of $800.00 per week because of rain days and fuel costs.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).

In January 2010, Wiggins told Bryant that the truck Bryant drove was not his and that Kynard requested that Wiggins put the truck in Wiggins's name so Kynard could downsize his operations at Kynard Logging.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  After the first FLSA lawsuit against Kynard Logging (which settled in early January 2010), Wiggins told Bryant to take the truck he drove for Wiggins Trucking to Kynard's father's house so it could be sold.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant understood he had no truck to drive and therefore, he was unable to work.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant made several calls asking about work but was not scheduled to return to work for Wiggins Trucking.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).

### 4.    Bryant's Second Employment With Double K Logging

Bryant returned to Double K Logging in March 2010 and was employed through July 2010.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).   Double K Logging paid Bryant  $700.00 per week.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Like during his first employment with Double K Logging, after working a five day work-week, Bryant worked several Saturdays for which he was not paid.  (Doc. #54, Bryant Dep. at 132-35).  Double K Logging did not pay Bryant time and half for all hours worked in excess of 40 hours per week.  (Doc. #67, Ex. T, Kynard Resp. to Pls' Requests for Admission No. 3).  Bryant had requested to be paid for overtime and to receive paid

13

health insurance, which was given to most Kynard Logging white employees.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 15).  Bryant was required to work most Saturdays and white drivers were not required to work weekends.[11]  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 15).  Double K Logging fired Bryant after he complained about working Saturdays, but not being paid for them.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 15).  In September 2010, the Alabama Department of Industrial Relations originally declared Bryant ineligible for benefits after a finding that he voluntarily left employment with Double K Logging.  (Doc. #54, Ex. A, Bryant Dep at 188-89; Doc. #54, Ex.#2 to Bryant Dep., Notice of Determination).  Either after a hearing on that determination or for some other reason, Bryant ultimately received some type of unemployment benefits.  (Doc. #54, Ex. A., Bryant Dep. at 192-93).

### F.    Teacher's Employment With Double K Logging

Teacher is an African American male who worked for Double K Logging from July 2009 until March 2010.  (Doc. #54, Ex. B, Teacher Dep. at 36; Ex. I, Payroll Records).   Teacher never worked for Kynard Logging or Wiggins Trucking.  (Doc. #54, Ex. B, Teacher Dep. at 49).  While employed by Double K Logging, Kynard and Breland were Teacher's supervisors.  (Doc. #66, Ex. B, Teacher Resp. to Defs' Interr. No. 4).  Kynard told Teacher he would be paid $140.00 per day.  (*Id.*).  Teacher was not paid when he worked on Saturdays or Sundays.  (Doc. #66, Ex. B, Teacher Resp. to Defs' Interr. No. 4).  Double K did not pay Teacher time and a half for all hours worked in excess of 40 hours per week.  (Doc. #66, Ex. T, Kynard Resp. to Teacher's Request for Admission No. 1).  When Teacher complained about working weekends without getting paid, Kynard told him

---

[11]Because it is undisputed that Double K Logging only employed African American truck drivers (Doc. #54, Ex. D, Kimbrel Dep. At 43-44), the court understands Bryant to be referring to Caucasian truck drivers employed by Johnny Kynard Logging.

he would have to sell Teacher's truck.  (Doc. #66, Ex. B, Teacher Resp. to Defs' Interr. Nos. 15, 16).

Teacher did not receive health insurance provided by Double K Logging.  (Doc. #66, Ex. B,  Teacher

Resp. to Defs' Interr. No. 15).   No one threatened to fire Teacher for asking about health insurance.

(Doc. #54, Ex. B., Teacher Dep. at 60).  No one told Teacher he was fired.  (Doc. #54, Ex. B, Teacher

Dep. at 96).  Teacher testified he was "forced to quit" his job with Double K Logging because he was

not getting paid to work weekends.  (Doc. #54, Ex. B, Teacher Dep. at 96).

## IV.    Discussion

### A.    Plaintiffs' FLSA Claims

#### 1.    FLSA Statute of Limitations

Generally, the statute of limitations for actions brought under the FLSA is two years;

however, a cause of action arising out of a willful violation of the FLSA may be commenced within

three years after the cause of action accrued.  29 U.S.C. § 255(a).   The employee has the burden to

prove that the employer committed a willful violation.  *McLaughlin v. Richland Shoe Co.*, 486 U.S.

128, 135 (1988).   A willful violation may be found when the employer knew or showed reckless

disregard for whether its conduct was prohibited by the FLSA.  *Id.* at 133.  "A willful violation may

be found when the employer 'disregarded the very 'possibility' that it was violating the statute.'"

*Allen v. Bd. of Ed.*, 495 F.3d 1306, 1323 (11th Cir. 2007), quoting *Alvarez v. IBP, Inc.*, 339 F.3d 894,

908-09 (9th  Cir. 2003).  In fact, the three year statute of limitations may apply even if the employer

did not knowingly violate the FLSA.  *Id.*

The three year statute of limitations may apply when the employer "simply disregarded the

possibility that it might be violating the FLSA."  *Id.*  However, if an employer acts reasonably but

not recklessly in determining its legal obligations under the FLSA, the employer's actions should not

15

be considered willful and the two-year statute of limitations applies.  *Id.* at 1323-24 (citing *Lockaby v. Top Source Oil Analysis, Inc.*, 998 F. Supp. 1469, 1471 (N.D. Ga. 1998)).

Defendants move for summary judgment on the wilfulness issue arguing that no evidence exists suggesting they recklessly disregarded whether they were in violation of the FLSA. Specifically, Kynard claims that when he was originally sued for FLSA violations in 2008, he began paying all employees of Kynard Logging by the hour and paying them overtime pay for any hours worked in excess of forty in a given workweek. (Doc. #54, Ex. C, Kynard Dep. at 52). Additionally, Kimbrel and Kynard argue that, as members of Double K Logging, they were under the impression that any logging operation that employed eight or fewer employees was exempt from the provisions of the FLSA. (Doc. #54, Kynard Dep. at 195-96; Doc #54, Ex. D, Kimbrel Dep. at 57). And Wiggins asserts that Wiggins Trucking did not pay Bryant overtime because he and Bryant agreed that Bryant would make $800.00 per week (Doc. #54, Ex. E, Wiggins Dep. at 182).

Plaintiffs counter these arguments and contend that Kynard and Double K Logging knew that Bryant and Teacher were not paid overtime for hours worked in excess of 40 hours per week while Plaintiffs worked for Double K Logging. (Doc. #67, Ex. T, Kynard Resp. to Bryant's Request for Admission 2; Doc. #67, Kynard Resp. to Teacher's Request for Admission 1; Doc. #67, Ex. U, Double K Resp. to Bryant's Request for Admission 20). Bryant also asserts that Wiggins did not pay him overtime for hours worked in excess of 40 hours during his employment with Wiggins Trucking. (Doc. #67, Ex. V, Wiggins Trucking's Resp. to Bryant's Request for Admission 26). Plaintiffs also note that Wiggins told Bryant that his truck was put in Kynard's name to help Kynard handle overtime issues related to a pending FLSA lawsuit. (Doc. #66, Ex A., Bryant Resp. to Defs' Interr. Nos. 4, 5; Doc. #66, Ex. C, Bryant Aff. at ¶ 28). Plaintiffs further contend that Kynard told

16

Kimbrel to keep the number of employees at Double K Logging down to avoid having to pay overtime under the FLSA. (Doc. #54, Ex. C, Kynard Dep. at 117-18).

The courts have generally determined that the question of willfulness is one of fact for a jury and generally is not appropriate for summary disposition. *See Morrison v. Qaulity Transports Servs.*, Inc., 474 F. Supp. 2d 1303, 1313 (S.D. Fla. 2007); *see also Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 162-63 (4th Cir. 1992) (holding that for purposes of determining willfulness under the FLSA, "there is no reason issues of willfulness should be treated any different from other factual determinations relating to application of a statute of limitations that are routinely submitted to a jury."). The court agrees in this case that, particularly in light of the facts contained in the Rule 56 record, it is for a jury to decide whether Defendants violated the FLSA and, if so, whether those violations were willful, thereby triggering the three-year statute of limitations. Therefore, Defendants' Rule 56 motion on the issue of willfulness is due to be denied.

### 2.    Plaintiffs' FLSA Overtime Claims

Defendants move for summary judgment on Plaintiffs' FLSA overtime claims only on the issue of coverage. They do not dispute that *if* they are deemed a single enterprise under the FLSA, then Plaintiff may combine the number of employees before determining whether they are exempt from FLSA coverage; they simply assert that they are not a single enterprise for purposes of the FLSA overtime provisions. Moreover, Defendants have not moved for summary judgment on the issue of liability. Thus, if coverage is found to exist, the issue of liability on Plaintiffs' FLSA overtime claims will be submitted to a jury. *See Patel v. Wargo*, 803 F.2d 632, 637 (11th Cir. 1986) ("The finding of enterprise is relevant only to the issue of coverage. Liability is based on the existence of an employer-employee relationship.").

Defendant Kynard Logging does not dispute that it is subject to the FLSA overtime provisions. Therefore, because Kynard Logging has not moved for a summary disposition on the question of liability, Kynard Logging is not entitled to summary judgment on Plaintiffs' FLSA overtime violation claims. Moreover, based upon the Rule 56 record, the court's summary judgment ruling on Plaintiffs' FLSA overtime claims against Defendants Double K Logging and Wiggins Trucking involve a determination of whether those entities are entitled to judgment as a matter of law on the issue of their exemption from the requirements of the FLSA.

The FLSA provides that certain industries and businesses are exempt from the requirements of the FLSA. Specifically, in the context of this case, Section 213(b)(28) provides that:

> the provisions of section 7 (maximum hour requirements) shall not apply with respect to any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight.

29 U.S.C. § 213(b)(28). Under this forestry exemption, "the determination of the number of employees employed in the named operations is to be made on an occupational and a workweek basis." 29 C.F.R. § 788.13 (2005). For any weeks during which the number of employees exceeded eight, Section 213(b)(28)'s exemption would not apply. The length of time an employee is employed in the named operations during a workweek is immaterial for counting the eight employees, except for replacement workers. 29 C.F.R. § 788.13 (2005).

The undisputed facts establish that Double K Logging is a logging operation that fells timber. (Doc. #54, Ex. C, Kynard Dep. at 26). Defendants assert that Double K Logging has not employed more than eight employees for any workweek within the statute of limitations period in this case, and

18

therefore the forestry exemption applies.  (*See* Doc. #54, Ex. C, Kynard Dep, p. 195; *see also* Doc. #54, Exhibit I, Payroll Records).  Plaintiffs argue that the exemption does not apply to Double K Logging because for several work weeks Double K Logging's records reveal it had more than eight employees.

According to Double K Logging payroll records from January 4, 2008 until May 5, 2010, Double K Logging employed as few as one employee but never more than eight employees.  (Doc. #54, Exhibit I, Payroll Records).  However, Plaintiffs contend that for some of those workweeks, Bryant and other employees actually worked for Double K Logging but were paid by Kynard Logging.  (Doc. #66, Ex. C, Bryant Aff. at 8).  Plaintiffs also submit that several employees received checks from Double K Logging who were not included on the payroll records.  (Doc. #66, Ex. Z, Double K Logging Employee Count).  Defendants counter that several of the individuals were not employed in the "named operation" and therefore should not be included in the employee count for purposes of determining whether the forestry exemption applies.  (Doc. #75-1, Kimbrel Aff. at 3-6). Based on this evidence, a dispute of fact exists regarding whether Double K Logging employed more than eight people for purposes of Section 213(b)(28)'s exemption.  Therefore, a jury must determine whether Double K Logging is independently subject to the FLSA overtime provisions or whether the forestry exemption applies.  A different analysis applies to Wiggins Trucking.

The undisputed facts also establish that Wiggins Trucking would transport felled timber for several logging companies.  (Doc. #54, Ex. E., Wiggins Dep. at 145-46).  Wiggins Trucking was paid a certain rate depending upon how far the truck had to travel to reach the mill.  (Doc. #54, Ex. E, Wiggins Dep. at 264-65).  However, while it was in operation, Wiggins Trucking only ever employed one person – Bryant.  (Doc. #54, Ex. J, Wiggins Payroll Records).  Therefore, so long as

19

Wiggins Trucking does not constitute a single enterprise with Kynard Logging and Double K Logging (an issue addressed below), Wiggins Trucking is not subject to the overtime provisions of the FLSA.

If Defendants Double K Logging and Wiggins Trucking are deemed a "single enterprise" along with Kynard Logging, Plaintiffs may argue that the total number of employees from all of the entities should be added together before deciding if the companies are exempt from the FLSA under 29 U.S.C. § 2132(b)(28). The FLSA defines the term "enterprise" as "related activities (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). Thus, the primary elements of the statutory definition are: (1) related activities; (2) unified operation or control; and (3) common business purpose. *See Donovan v. Easton Land*, 723 F.2d 1549, 1551 (11th Cir. 1984). This determination is a question of law for the court to decide. *Dunlop v. Ashy*, 555 F.2d 1228, 1229 (5th Cir. 1977).[12] However, at this stage, genuine disputes of fact exist that prevent the court from ruling on this issue as a matter of law. The court will reserve this determination for some time during trial after a jury makes certain findings of fact related to this issue. Therefore, Defendants are not entitled to judgment under Rule 56 on Plaintiffs' FLSA overtime violation claims.

### 3.    Plaintiff Bryant's FLSA Retaliation Claim

To establish a retaliation claim under the FLSA, Bryant must prove that "any person...discharge[d] or in any other manner discriminate[d] against [him] because [he]...filed any complaint or instituted or caused to be instituted" an FLSA action. *See* 29 U.S.C. § 215(a)(3). The

---

[12]The decisions of the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, are binding in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

retaliatory provision provides broader coverage than the minimum wage and hour provisions of the FLSA, and apply even if an employee cannot show "individual coverage" or "enterprise coverage." *See Wirtz v. Ross Packaging Co.*, 367 F. 2d 549, 550-51 (5th Cir. 1966) (the "unambiguous language of the statute refutes the district court's view that either the employee or his employer must be engaged in activities covered by the [FLSA's] wage and hour provisions in order for the strictures against discriminatory discharge to be invoked").  Bryant is therefore not precluded as a matter of law from asserting a FLSA retaliation claim against Defendants if he can establish a *prima facie* case.

To establish a *prima facie* case of FLSA retaliation, Bryant must demonstrate the following: "(1) [he] engaged in activity protected [under] the act; (2) [he] subsequently suffered adverse action by the employer; and (3) a causal connection existed between the [his] activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000).  Moreover, if Defendants are considered joint-employers, all may be subject to liability.[13]  Bryant alleges that Defendants retaliated against him in violation of the FLSA after he complained about not getting paid to work overtime on Saturdays by terminating his employment in July 2010, and by threatening to frame him with a false drug charge after filing this lawsuit.

---

[13]Whether a party qualifies as a joint employer for liability purposes depends on whether "as a matter of economic reality, the individual is dependent on the entity." *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996). Under the FLSA, "[a] determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case" 29 C.F.R. § 791.2.  Factors considered include control, supervision, right to hire and fire, ownership of work facilities, investment, and pay-roll decisions." *Antenor*, 88 F.3d 932-37.   As explained in the opinion text, genuine issues of fact regarding the second element of Bryant's *prima facie* case preclude summary judgment on this claim.  Additionally, based upon the facts in this case, reasonable jurors may disagree over whether Defendants are considered joint employers for purposes of liability.  Therefore, summary judgment is due to be denied as to all Defendants on Bryant's FLSA retaliation claims.

### a.   Protected Activity

An employee engages in protected activity if he "file[s] any complaint or institutes or cause[s] to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding. . . ." 29 U.S.C. § 215(a)(3).  In the Eleventh Circuit, an oral complaint about an alleged violation of the FLSA is enough to trigger anti-retaliation coverage. *EEOC v. White & Sons Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989).  An employee need not meet a particular level of formality for his action to qualify as protected activity.  *See Jones v. Hamic*, 875 F. Supp. 2d 1334, 1351 (M.D. Ala. 2012).  The test is whether the employee's action "was sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011).[14]

### i.   Oral Complaints to Supervisors at Double K Logging

As evidence of protected activity, Kynard points to his complaints to his supervisors at Double K Logging about not being paid overtime and his filing of this lawsuit.  An oral complaint is protected conduct under the FLSA's anti-retaliation provision.  *White & Son Enters.*, 881 F.2d at 1011 (interpreting the FLSA anti-retaliation provision as protecting employees who make internal "informal complaints" to their employer about FLSA violations).   Bryant has testified that he complained to his shift supervisor that he was not getting paid to work on Saturdays.  (Doc. #66, Ex. A., Bryant Resp to Defs' Interr. Nos. 4, 16).  Defendants have not disputed that Bryant made such

---

[14] Although *Kasten* left open the question whether an internal complaint (without a judicial complaint) is sufficient to support a FLSA retaliation claim, again, in the Eleventh Circuit an oral complaint is enough.  *White & Sons*, 881 F.2d at 1011.

a claim.  Thus, Bryant has established the first element of this relation claim for purposes of this motion.

### ii.      Filing Lawsuit

In addition, by filing this lawsuit, which alleged FLSA overtime violations, Byrant engaged in protected activity.  *See* 29 U.S.C. § 215(a)(3) (employee engaged in protected activity when he "file[s] any complaint or institutes or cause[s] to be instituted any proceeding under or related to this chapter").  Bryant originally filed suit against Defendants on February 18, 2011.  (Doc. #1).  The complaint alleges that Defendants did not pay Bryant for overtime, which he claims he should have received for working over forty hours in various work weeks.  (*See* Doc. #1).  Therefore, as Bryant filed a complaint and instituted a proceeding under the FLSA, the record shows that this conduct is protected activity under the statute.  *See* 29 U.S.C. § 215(a)(3).

### b.      Adverse Employment Action

Genuine issues of fact exist regarding whether Bryant suffered an adverse employment action.  An adverse employment action may include an ultimate employment decision, such as the decision to terminate an employee.  *See Shannon v. Bellsouth Telecomm., Inc.*, 292 F. 3d 712, 716 (11th Cir. 2002).  However, an employee's discharge is not the only conduct that is actionable.  An employer's actions may constitute an adverse action if it reaches "some threshold level of substantiality."  *Id.*  The inquiry is whether an employer's actions likely would have "dissuaded a reasonable worker from making or supporting a charge" against the employer.  *Burlington Northern & Sante Fe Ry. Co v. White*, 548 U.S. 53, 68 (2006).  The court evaluates Plaintiffs' arguments regarding the issue of adverse employment action in turn.

Bryant alleges Defendants terminated his employment with Double K Logging on July 30, 2010, shortly after he verbally complained to his supervisor about wage and hour issues.  Genuine issues of fact exist regarding whether Bryant was terminated or voluntarily left his employment. Bryant has testified that Kynard told the supervisor to tell Bryant that if he could not work on Saturdays not to come back to work.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. No. 16). Kimbrel and Kynard claim that Bryant quit after he failed to show up for scheduled work.  (Doc. #54, Ex. C., Kynard Dep. at 199; Doc. #54, Ex. D, Kimbrel Dep. at 90).  Additionally, the original Alabama Department of Industrial Relations report denying Bryant's unemployment benefits started stated that he voluntarily quit by refusing to show up for work. (Doc. #54, Ex. A, Bryant Dep., Exhibit #2).  Eventually, however, whether due to a reconsideration of that determination or for some other reason, Bryant received unemployment benefits.  (Doc. #54, Ex. A. Bryant Dep. at 189-92). Bryant claims he was fired for complaining about not getting paid to work overtime.  Kynard contends that Bryant voluntarily left his employment.  After careful review, the court concludes that genuine issues of fact exist regarding whether Kynard and Double K discharged Bryant or whether Byrant voluntarily quit.

As evidence of an adverse action, Byrant also points to phone calls he received from Wiggins (soon after filing this law suit) informing him (Bryant) that Kynard was trying to frame him with a false drug charge.  (Doc. #66, Ex. C, Bryant Aff. at ¶34).  Defendants deny they called Bryant or attempted to frame him with a false drug charge.  (Doc. #54, Ex. C., Kynard Dep. at 122; Doc. #54, Ex. E, Wiggins Dep. at 19).  Thus, a genuine issue of fact exists regarding whether Defendants tried to frame Bryant with a false drug charge.

### c.      Causal Connection

If Bryant indeed suffered an adverse employment action, the Rule 56 facts are sufficient for the trier of fact to find there was a causal connection between Bryant's complaint and his termination from Double K Logging in July 2010.  To establish a causal connection, Bryant must establish that "[he] would not have been fired but for [his] assertion of FLSA rights."  *Wolf*, 200 F. 3d at 1343. A plaintiff can satisfy this burden if he proves "a close temporal proximity" between the time his employer learned about the protected activity and his discharge.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, mere temporal proximity, without more, must be "very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  The court now analyzes how the Rule 56 record relates to these legal rules.

### i.      Oral FLSA Complaint/Double K Logging Termination

Bryant has stated he was no longer employed by Double K Logging "within a few days" of his complaint to his supervisor about not being paid overtime.  (Doc. #66, Ex. A., Bryant Resp to Defs' Interr. No. 16).  After careful review, the court finds that if Bryant can establish he suffered an adverse employment action, he has demonstrated that a causal connection existed between his complaint and that adverse action.

### ii.      Filing Lawsuit/False Drug Charge

Bryant filed a lawsuit against Defendants alleging FLSA violations on February 18, 2011. The Rule 56 evidence would support a finding that Wiggins called Bryant on March 23, 2011 and April 1, 2011.  (Doc. #63, Wiggins Phone Records).  If a jury finds (as Bryant contends) that the purpose and substance of these phone calls were in fact related to Defendants' attempts to frame Bryant with a false drug charge because he had filed suit under the FLSA, the court finds that

25

evidence is sufficient to allow Bryant to establish the causal connection element of his *prima facie* case.  The Eleventh Circuit has commented (albeit in an unpublished decision) that a two month temporal proximity is not "very close" as required to establish the causal connection.  *See Williams v. Waste Mgmt., Inc*., 411 Fed. Appx. 226, 229-30 (11th Cir. 2011).  Other courts within the circuit have found a two month gap between protected activity and adverse action sufficient to establish a causal connection.  *See Gaddis v. Russell Corp*., 242 F. Supp. 2d 1123, 1147 (M.D. Ala. 2003).  Here, the purported adverse action occurred between five and six weeks after Bryant engaged in statutorily protected expression. Therefore, after careful review, and in the unique context of this case, the court finds that Bryant has established a causal connection.

Bryant has presented substantial evidence with respect to each element of a *prima facie* FLSA retaliation case (although, as noted, genuine issues of fact exist regarding whether Bryant suffered an adverse employment action).  For the reasons stated above, summary judgment is due to be denied on this claim because it will be for the jury to decide the issue of pretext.

**B.      Plaintiff Bryant's Title VII Race Discrimination and Section 1981 Race Discrimination Claims**

Bryant alleges disparate treatment and disparate impact Title VII and Section 1981 race discrimination claims.  Defendants argue they are entitled to summary judgment because (1) Bryant cannot establish a *prima facie* case, and (2) in the alternative, the non-discriminatory reasons for their treatment are not pretextual.  The court will address Defendants' assertions independently starting with Bryant's disparate treatment claims.

1.        **Bryant's Disparate Treatment Claims**

Title VII racial disparate treatment claims and Section 1981 race discrimination claims are evaluated using the same analytical framework.  *Standard v. A.B.E.I. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and Section 1981] have the same requirements of proof and use the same analytical framework as well; therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").   Thus, the court analyzes Plaintiff Bryant's disparate treatment Title VII and Section 1981 race discrimination claims as a single claim for purposes of summary judgment.

Bryant has not submitted any direct evidence of discrimination.  *See Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002) ("Direct evidence is composed only of the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor.").  Bryant has presented only circumstantial evidence of race discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now familiar framework established by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997) (parallel citations omitted).

Under the *McDonnell Douglas*/*Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. Finally, if the defendant carries its burden of production, the plaintiff must present substantial evidence which shows either (1) that the legitimate

reasons offered by the defendant are merely a pretext for discrimination *or* (2) a reasonable jury could conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54.   A plaintiff in an employment discrimination case maintains the ultimate burden of proving that an adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000).

Bryant claims Defendants discriminated against him by paying him less than similarly situated white co-workers and by refusing to provide him with insurance coverage available to similarly situated white co-workers.  To establish a *prima facie* case, Bryant must show that: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class."  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Neither party disputes that Bryant, an African American, is a member of a protected class. Likewise, no party disputes that Bryant was qualified for his position as a truck driver for Defendants, or Bryant's level of compensation, or that he did not receive insurance benefits. Therefore, the questions remaining are whether Bryant can establish that he was (1) paid less than similarly situated white employees, and/or (2) treated less favorably than similarly situated employees outside his protected class with regard to the receipt of insurance benefits.

28

### a.     Disparate Treatment in the Area of Pay

#### i.     *Prima Facie* Case

As already noted, the court's inquiry here is limited to whether Bryant can establish the fourth element of his *prima facie* case — namely, whether he  was paid less than similarly situated employees outside his protected class.  The court analyzes this question in relation to Bryant's employment with Kynard Logging, Double K Logging, and Wiggins Trucking.

When Bryant worked for Kynard Logging he was paid $600.00 per week. (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  The three white truck drivers employed by Kynard Logging each made $650.00, $750.00, and $800.00 per week.  (Doc. #67, Ex. 2, Comparison of Driver Pay by Race).  Thus, these undisputed facts establish that the white truck drivers at Kynard Logging were paid more than Bryant.  Therefore, while employed by Kynard Logging, a jury could find that Bryant was treated less favorably than similarly situated employees outside his protected class.

While employed by Double K Logging, Bryant was paid $700.00.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Double K Logging only employed African American truck drivers.  (Doc. #54, Ex. D, Kimbrell Dep. at 43-44).

While employed at Wiggins Trucking, Bryant was paid $800.00 per week.  (Doc. #66, Ex. A, Bryant Resp. to Defs' Interr. 4).  Bryant was the only employee at Wiggins Trucking while it was in operation.  (Doc. #54, Ex. J, Wiggins Payroll Records).

Defendants contend that Bryant cannot establish a *prima facie* case against Double K Logging or Wigging Trucking because (1) Double K Logging only employed African American drivers, and (2) Bryant was Wiggins Trucking's only employee.  According to Defendants, for these reasons Bryant cannot establish that while working at Double K Logging and Wiggins Trucking he

was treated less favorably than a similarly situated employee.  The court finds, however, that disputes of fact exist regarding whether Double K Logging and Wiggins Trucking are joint employers for purposes of Title VII liability.  "[T]he joint employer concept recognizes that the businesses involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment."  *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1122 (3rd Cir. 1982).  The Eleventh Circuit has adopted and follows the National Labor Relations Board's test to determine whether single business entities should be considered joint employers.  *See McKenzie v. Davenport-Harris Funeral Home*, 834 F. 2d 930, 933 (11th Cir. 1987).  Relevant factors include: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; (4) common ownership and financial control.  *Id.*  Here, questions of fact exist as to Kynard's influence and control over Bryant's terms and conditions of employment at Kynard Logging, Double K Logging, and Wiggins Trucking.  To be sure, reasonable fact finders could conclude that Defendants Kynard Logging, Double K Logging, and Wiggins Trucking were joint employers of Bryant for purposes of Title VII liability, and Bryant was paid less than white drivers employed by Kynard Logging.

### ii.  Legitimate, Non-Discriminatory Reason and Pretext Analysis

Because questions of fact preclude summary judgment at the *prima facie* case stage, the court now turns to whether Defendants have rebutted the presumption of discrimination by offering legitimate, non-discriminatory reasons for the disparity in pay.  Defendant Kynard has testified that an employee's skill and how long he has been employed were factors he used to determined how much they were paid.  (Doc. #54, Ex. C, Kynard Dep. at 178).  Kynard has also testified that

compensation decisions were not made on the basis of race. (Doc. #54, Ex. C, Kynard Dep. at 101). If believed by a finder of fact, this evidence would support a finding that Defendants did not consider Bryant's race in paying him less than white employees who performed the same work. *See St. Mary's Honor Cntr., v. Hicks*, 509 U.S. 502, 507 (1993). In light of Defendants' legitimate, non-discriminatory reasons for their pay decisions, the question become whether those articulated reasons are a pretext for race discrimination. *See Trotter v. Bd. of Trustees of the Univ. of Ala.*, 91 F. 3d 1449, 1456-57 (1996). After careful review, the court concludes that it is for the jury to determine whether Bryant was paid less than Caucasian workers because of his race. Therefore, with the exception of Bryant's Title VII disparate pay claim against Kynard in his individual capacity, Defendants are not entitled to summary judgment on this claim.[15]

> **b.    Disparate Treatment in the Area of Insurance Benefits**
>
> **i.    *Prima Facie* Case**

As already discussed above, Bryant can establish that he is a member of a protected class, was qualified for his job as a truck driver, and was denied health insurance benefits given to other employees. Thus, the court's inquiry here focuses solely on whether Bryant can establish that he was treated less favorably than other similarly situated employees. The undisputed facts establish that Sammie Williams, an African American truck driver who worked for Kynard Logging from 2003 until 2008 and for Double K Logging from 2008 until 2010, received health insurance benefits from Defendants Kynard Logging and Double K Logging. (Doc. #66, Ex. 3, Interchanges of Employees). Defendants therefore assert that Bryant has failed in his attempt to show that he was treated less favorably than a similarly situated white truck driver.

---

[15]*See infra* notes 17, 18.

### ii. Legitimate, Non-Discriminatory Reason and Pretext Analysis

As evidence of a legitimate, non-discriminatory reason for failing to provide health insurance benefits to Bryant, Kynard has testified that when he followed up with Bryant about insurance benefits, Bryant told him he did not want it because he had All Kids insurance and receiving health insurance through Kynard would disqualify him from receiving All Kids.[16] (Doc. #54, Ex. C, Kynard Dep. at 46-47). Bryant disputes this fact and claims he never had such a conversation with Kynard. (Doc. #66, Ex. C, Bryant Aff. at ¶¶ 31-32). Based on these disputes of fact, it is for the fact finder to determine whether race was the reason that Defendants denied Bryant health insurance benefits. *Albers v. Mellegard, Inc.*, 2008 WL 7122683, at *9 (D.S.D. 2008) (finding genuine issues of material fact existed as to denial of health insurance claim). Therefore, summary judgment is due to be denied as to all Defendants, except Kynard individually,[17] on Bryant's Title VII disparate treatment discrimination claims. Summary judgment is due to be denied as to all Defendants on Bryant's Section 1981 discrimination claims.[18]

---

[16] Kynard also testified that no African American employees asked him about insurance, but that white employees did ask him about receiving health insurance. (Doc. #54, Ex. C, Kynard Dep. at 43-44). When asked why white employees knew to ask for health insurance, Kynard testified that he had no idea, that he did not know, and that he did not want to say. (Doc. #54, Ex. C, Kynard Dep. at 44).

[17] The relief granted under Title VII is against the employer, not an individual employee whose actions may constitute a violation of the act. *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). "Individual capacity suits under Title VII are...inappropriate." *Id.* For this reason, *all* Title VII claims made against Kynard in his individual capacity are due to be dismissed.

[18] Contrary to Title VII, "individual employees can be held liable for discrimination under § 1981." *Leige v. Capitol Chevrolet, Inc.*, 895 F. Supp. 289, 293 (M.D. Ala. 1995). Thus, unlike Bryant's Title VII claims, Kynard individually may be liable under Section 1981 and summary judgment is not appropriate as to Bryant's Section 1981 claims against Kynard in his individual capacity. *See id.* ("Supervisors with the capacity to hire and fire or those who can recommend such decisions are subject to liability under § 1981.").

### 2.    Bryant's Disparate Impact Claims

An employer's facially neutral policy or practice may be found unlawful under a disparate impact theory — even without a showing of discriminatory intent — if that policy or practice has a significant disparate impact on a protected group. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971). The Civil Rights Act of 1991 codified this and other disparate impact standards into Section 703 of Title VII. 42 U.S.C. § 2000e-2(k).

Although Plaintiffs appear to have asserted Title VII and Section 1981 disparate impact claims, because Section 1981 requires proof of intentional discrimination, a plaintiff may not entertain an impact theory under that statute. A Title VII disparate impact violation can be found without a finding of a discriminatory motive. The same is not true under Section 1981, which requires proof of intentional discrimination. *See Gen. Bldg. Contractors Ass'n Inc., v. Pennsylvania*, 458 U.S. 375, 383 n. 8 (1982); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). Therefore, Bryant can only maintain a disparate impact claim under Title VII, not Section 1981.

The Title VII disparate impact framework is well-settled. "Since *Griggs*, Congress has codified the appropriate burdens of proof in a disparate impact case in [Section 703], and a settled jurisprudence has arisen to implement the methodology." *In re Employment Discrimination*, 198 F.3d 1305, 1311 (11th Cir. 1999). "Disparate impact cases typically focus on statistical disparities and on the various explanations for those disparities." *Nash v. Consolidated City of Jacksonville, Duval Cnty., Fla*, 895 F. Supp. 1536, 1541 (M.D. Fla. 1995). To establish a *prima facie* case under a theory of disparate impact, Bryant must show: (1) the existence of a statistically significant disparity among members of different groups affected by employment decisions; (2) the existence of a specific, facially neutral employment practice; and (3) a causal nexus between the specific,

facially neutral employment practice and the statistical disparity.  42 U.S.C. § 2000e-2(k); *see also*,

*e.g.*, *EEOC v. Joe's Stone Crab*, 220 F.3d 1263, 1274 (11th Cir. 2000).

Here, as evidence of a facially neutral policy, Bryant points to Defendants' decision to

provide health insurance to certain employees but not others, which he claims causes a disparate

impact on African American employees.  However, simply showing that Bryant was subject to this

subjective policy does not establish a *prima facie* case of disparate impact.  "[T]he plaintiff's burden

in establishing a *prima facie* case goes beyond the need to show that there are statistical disparities

in the employer's work force."  *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

Additionally, the plaintiff "must offer statistical evidence of a kind and degree sufficient to show that

the practice in question has caused the exclusion of applicants for jobs or promotions because of

their membership in a protected group."  *Id.* at 994-95.  Bryant has failed to establish that

Defendants' subjective exercise of discretion in deciding which employees received health insurance

has caused a statistically significant disparate impact on black employees.  Rather, Bryant's race

discrimination claims, properly viewed, really assert claims of disparate treatment.

To establish the first element of his disparate impact claim, Bryant relies upon a chart that

Bryant claims "shows that Kynard overwhelming[ly] selected to give [insurance benefits] to his

white employees over his black employees."  (Doc. #68, pg. 49).  However, this simply is not

supported by the Rule 56 evidence submitted.  The only evidence Bryant submits regarding any

possible disparity is a chart created from data provided by Kynard Logging.  This chart reflects that

ten out of eighteen white employees received health insurance benefits.  (*See* Doc. #66, Ex. 1,

Employees Who Received Paid Family Health Insurance by Race).  Notably, the chart also reflects

that both African American employees received health insurance benefits.  (*See* Doc. #66, Ex. 1,

34

Employees Who Received Paid Family Health Insurance by Race).  According to Bryant's own statistical evidence, 100% of the African American employees received health insurance benefits while only 55% of white employees received this benefit.[19]  Not only does Bryant's evidence fail to establish a significant statistical disparity, it fails to establish any disparity at all.  Accordingly, Bryant cannot establish a *prima facie* case of racial discrimination under a disparate impact theory. Thus, all Defendants are entitled to summary judgment on Bryant's disparate impact Title VII claims.

### C.      Plaintiff Teacher's Section 1981 Race Discrimination Claims

The court analyzes Teacher's Section 1981 race discrimination claims under the same framework discussed and applied above for Bryant's Title VII and Section 1981 discrimination claims.  *See Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir. 2000) (holding that Title VII and § 1983 claims have the same elements where the claims are based on the same set of facts); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (holding that Title VII and § 1981 claims are analyzed in the same manner).  Like Bryant, Teacher  claims Defendants discriminated against him by paying him less than similarly situated white co-workers and by refusing to provide him with insurance coverage available to similarly situated white co-workers.  To establish a *prima facie* case, Teacher must show that: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person

---

[19] More particularly, Bryant submitted a chart (Doc. #66, Ex. 1) which indicates that Matthew Moore (white) and Sammie Williams (black) had worked for Kynard Logging but were employed by Double K Logging as of March 19, 2010.  (*Id*.).  Both received insurance.  (*Id*.).  With this limited exception, Bryant has not submitted any relevant statistical data regarding Double K Logging's provision of insurance to employees.  As already noted, Bryant was the only employee of Wiggins Trucking during the relevant time period.  Thus, even assuming that the three Defendants in this case are deemed joint employers, there is simply no evidence (statistically significant or otherwise) whatsoever that any subjective practice of providing insurance to some but not all employees had a disparate impact on black employees of the companies.

outside his protected class or was treated less favorably than a similarly situated individual outside his protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Neither party disputes that Teacher, an African American, is a member of a protected class. Likewise, neither party disputes that Teacher was qualified for his position as a truck driver for Defendants. Nor does any party dispute that Teacher's compensation or that he did not receive insurance benefits. Therefore, the question is whether Teacher can establish that he was treated less favorably than employees outside his protected class with respect to his claims of race discrimination in the areas of pay and provision of insurance benefits. The court addresses each of these claims in turn.

### 1.    Disparate Pay Claim

#### a.    *Prima Facie* Case

Regarding his disparate pay claims, Teacher only worked for Defendant Double K Logging, and he was paid $700.00 per week. (Doc. #54, Ex. B, Teacher Dep at 36; Doc. #66, Ex. 2, Driver Pay by Race). Double K Logging only employed African American truck drivers. (Doc. #54, Ex. D, Kimbrell Dep. at 43-44). Thus, Defendants contend that Bryant cannot establish he was paid less than a similarly situated employee outside his protected class. However, Teacher was paid less than two white drivers who worked at Kynard Logging. (Doc. #54, Ex. D, Kimbrell Dep. at 43-44). As already noted, Kynard's level of influence and control over the terms and conditions of employment of Kynard Logging and Double K Logging employees would permit reasonable fact finders to conclude that these Defendants are joint employers for purposes of Plaintiffs' statutory claims.

### b.      Legitimate, Non-Discriminatory Reason and Pretext Analysis

Because Teacher has presented substantial evidence that white truck drivers at Kynard Logging are comparators, it is incumbent upon Defendants to articulate a legitimate, non-discriminatory reason for paying Teacher less than white truck drivers.  Defendant Kynard has testified that an employee's skill and how long they had been employed were factors he used to determined how much they were paid.  (Doc. #54, Ex. C, Kynard Dep. at 178).  Kynard has also testified that compensation decisions were not made on the basis of race.  (Doc. #54, Ex. C, Kynard Dep. at 101).  In light of Defendants' legitimate, non-discriminatory reasons for this action, the question becomes whether those articulated reasons are a pretext for race discrimination.  *See Trotter*, 91 F. 3d at 1456-57 (1996).

In opposition, Teacher cites 2009 interrogatory responses from Kynard Logging in the *Webb* case, which indicate that Kynard Logging did not have a policy and procedure for determining raises and bonuses and that pay was "generally" determined by job duties and length of employment. (Doc. #66, Ex. N, Kynard Logging Resp. to Interrog. No. 6).  The court has already addressed a similar pay claim asserted by Bryant.  Consistent with the court's analysis of that claim, it concludes that Teacher has presented sufficient evidence of pretext, and the trier of fact must decide fact issues concerning whether his race was considered in setting his pay.

### 2.      Disparate Provision of Insurance Benefits Claim

### a.      *Prima Facie* Case

It is undisputed that Teacher is a member of a protected class, was qualified for his job as a truck driver, and did not receive insurance benefits given to other employees.  The undisputed facts also establish that Sammie Williams, an African American truck driver who worked for Kynard

Logging from 2003 until 2008 and for Double K Logging from 2008 until 2010, received health insurance benefits from Defendants Kynard Logging and Double K Logging.  (Doc. #66, Ex. 3, Interchanges of Employees).  Defendants therefore assert that Teacher was not treated less favorably than a similarly situated truck driver.

### b.       Legitimate, Non-Discriminatory Reason and Pretext Analysis

Similar to the analysis of the wrongful denial of health insurance claim asserted by Bryant, the court concludes that to the extent Defendants have articulated a legitimate, non-discriminatory reason as to why Teacher did not receive health insurance benefits, it is for a jury to decide if the actual reason for such failure is because of Teacher's race.  *Albers*, 2008 WL 7122638, at *9. Therefore, with the exception of Wiggins Trucking,[20] Defendants are not entitled to summary judgment on Teacher's Section 1981 race discrimination claims.

### D.       Plaintiff Bryant's Title VII and Section 1981 Retaliation Claims

In the employment context, the same substantive analysis applies to cases involving allegations of race discrimination that also assert Title VII and Section 1981[21] claims of retaliation. *Turnes v. AmSouth Bank N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).  Title VII's provisions provide a remedy for only certain types of retaliation.  Title VII contains two separate and distinct clauses

---

[20]The undisputed facts indicate that Teacher never worked for Wiggins Trucking.  Moreover, the facts Teacher relies upon to support his Section 1981 discrimination claim in no way implicate Defendant Wiggins Trucking. Therefore, Wiggins Trucking is entitled to summary judgment on Teacher's Section 1981 discrimination claims.

[21] Section 1981 of the Civil Rights Act of 1866 prohibits racial discrimination that inhibit's a plaintiff's right "to make and enforce contracts." 42 U.S.C. § 1981(a).  By passing the Civil Rights Act of 1991, Congress clarified that the right to contract includes "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Neither the language of Section 1981 or that of the Civil Rights Act of 1991 reference "retaliation."  Nevertheless, the Supreme Court has made clear that retaliation claims are cognizable under Section 981.  *CBOCS West Inc. v. Humphries*, 553 U.S. 442 (2008); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412 (11th Cir. 1998).  To be sure, however, only retaliatory acts taken in response to rights protected by Section 1981 are actionable.  *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010).

prohibiting retaliation against covered persons.  First, the opposition clause protects an employee who "has opposed any practice made an unlawful employment practice" under Title VII.  *See* 42 U.S.C. § 2000e-3(a); *E.E.O.C. v. Total Sys. Servs.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  For example, "[t]he opposition clause protects activity that occurs prior to the filing of a formal charge with the EEOC, such as filing an internal complaint of discrimination with an employer or informally complaining of discrimination to one's supervisors."  *Vinson v. Fla. Dept. of Corrections*, 672 F. Supp. 2d 1247, 1254 (N.D. Fla. 2009) (citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001)).  Second, the participation clause prevents an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *See* 42 U.S.C. § 2000e-3(a).   The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC. . . ."  *Total Sys. Servs.*, 221 F.3d at 1174.  The court addresses Bryant's claim below.

### 1.     *Prima Facie* Case

To establish a *prima facie* case of retaliation under Title VII and Section 1981 here, Bryant must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *See Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008).

### a.     Protected Activity

Bryant's retaliation claim rests solely on his contention that he was retaliated against for filing the instant lawsuit on February 18, 2011.  Here, it is beyond dispute that Bryant has engaged in protected activity by virtue of that participation in the EEO process.  The participation clause

protects the filing of a lawsuit alleging Title VII violations.  *See Vinson*, 672 F. Supp. 2d at 1261.

Plaintiffs' original complaint contained headings for Title VII discrimination and retaliation counts

and stated that these counts had been reserved for amendment following receipt of a right to sue

letter from the EEOC.  The filing of the complaint constitutes statutorily protected activity.  Thus,

the court finds that Bryant can establish the first element of a Title VII and Section 1981 retaliation

claim.

### b.      Adverse Action

Genuine disputes of material fact exist regarding whether Bryant can establish the

second element of his *prima facie* case.   Adverse employment actions can fall short of ultimate

employment decisions.  *See Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006);

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).  In the retaliation context,

adverse employment actions are those that "might have dissuaded a reasonable worker from making

or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68.  However, the statute does

require some level of materiality "to separate significant from trivial harms."  *Id.*  "Title VII...does

not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner

Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

The evidence indicates that after Bryant filed this lawsuit, Wiggins called him at home and

told him that he (Wiggins) had been informed by Kynard that Bryant was selling drugs and that he

had police watching him.  (Doc. #66, Ex. C, Bryant Aff. at ¶34).  Bryant claims Wiggins also told

him this to make sure he kept his truck and car doors locked.  (Doc. #66, Ex. C, Bryant Aff. at ¶34).

Later, a police officer in town also warned Bryant to be careful.  (Doc. #66, Ex. C, Bryant Aff. at

¶34).  Wiggins denied calling Bryant after the lawsuit was filed.  (Doc. #54, Ex. E, Wiggins Dep.

at 19-20).  Phone records indicate Wiggins did indeed call Bryant at least twice.  (Doc. #63, Ex. PP, Wiggins Phone Records).  Defendants deny that they ever tried to or threatened to frame Bryant with a false drug charge.  (Doc. #54, Ex. C., Kynard Dep. at 122; Doc. #54, Ex. E, Wiggins Dep. at 19). Based upon this record evidence, there is a genuine issue of fact regarding whether Bryant was subject to an adverse employment action.

### c.      Causal Connection

Bryant filed a lawsuit against Defendants on February 18, 2011.  (Doc. #1).  The original complaint contained headings for Title VII claims but reserved asserting any factual allegations until Bryant received his right to sue letter from the EEOC.  (*See* Doc. #1).  The evidence establishes that Wiggins called Bryant on March 23, 2011 and April 1, 2011.  (Doc. #63, Wiggins Phone Records). If a jury did find that the substance of these phone calls were in fact related to Defendants' attempts to frame Bryant with a false drug charge, then Bryant has established the causal connection element of his *prima facie* case.  The Eleventh Circuit has noted that a two month temporal proximity is not "very close" as required to establish the causal connection.  *See Williams v. Waste Mgmt., Inc.*, 411 Fed. Appx. 226, 229-30 (11th Cir. 2011).  Other courts within the circuit have found a two month gap between protected activity and adverse action sufficient to establish a causal connection.  *See Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1147 (M.D. Ala. 2003).  Here, the purported adverse action occurred between five and six weeks after Bryant engaged in statutorily protected expression. Therefore, the court finds that Bryant has presented sufficient evidence for Rule 56 purposes with respect to the issue of causal connection.

### 2. Defendants' Legitimate, Non-Discriminatory Reason and Pretext Analysis

Bryant has submitted enough Rule 56 evidence to allow his claim that Defendants attempted to frame him with a false drug charge in retaliation for his having filed this lawsuit to proceed to a jury trial. To the extent Defendants have articulated a legitimate non-discriminatory reason for this conduct,[22] it is for the trier of fact to determine if there was a retaliatory motive behind this conduct. Therefore, with the exception of the Title VII claims against Kynard individually,[23] summary judgment is due to be denied as to Bryant's retaliation claims.[24]

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is due to be granted in part and denied in part.

Summary judgment is due to be granted as it relates to all Defendants on the following claims:

- Plaintiff Teacher's Title VII Discrimination and Retaliation Claims;

- Plaintiff Teacher's FLSA Retaliation Claims; and

- Plaintiff Bryant's Title VII Disparate Impact Claims.

Summary judgment is also due to be granted as it relates to Defendant Johnny Kynard individually on the following claims:

- Plaintiff Bryant's Title VII Discrimination and Title VII Retaliation Claims.

---

[22]Defendants' position appears to be that they have not engaged in this retaliatory conduct, but it is for a jury to decide if that is so.

[23]*See supra* note 17.

[24]*See supra* note 18.

Further, summary judgment is due to be granted as it relates to Defendant Wiggins Trucking on the following claims:

- Plaintiff Teacher's Section 1981 Race Discrimination Claims.

Summary judgment is due to be denied as it relates to all Defendants on the following claims:

- Plaintiffs Bryant and Teacher's FSLA Overtime Violation Claims;

- Plaintiff Bryant's FLSA Retaliation Claim;

- Plaintiff Teacher's Section 1981 Race Discrimination Claim; and

- Plaintiff Bryant's Section 1981 Race Discrimination and Retaliation Claims.

Finally, summary judgment is due to be denied as it relates to Defendants Kynard Logging, Double K Logging, and Wiggins Trucking on the following claims:

- Plaintiff Bryant's Title VII Race Discrimination and Retaliation Claims.

A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this ____8th____ day of March, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE